UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LISA M. JACKSON,                )       CASE NO.  3:13-CV-2199
                                )
            Plaintiff,          )
                                )       MAGISTRATE JUDGE MCHARGH
        v.                      )
                                )
COMMISSIONER OF SOCIAL          )       **MEMORANDUM OPINION & ORDER**
SECURITY ADMINISTRATION,        )
                                )
            Defendant.

This case is before the undersigned pursuant to the consent of the parties.  (Doc. 15).  The issue before the Court is whether the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff Lisa Jackson's ("Plaintiff" or "Jackson") applications for a Period of Disability and Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income Benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, is supported by substantial evidence and therefore, conclusive.

For the reasons set for the below, the Court AFFIRMS the decision of the Commissioner.

## I.       PROCEDURAL HISTORY

Jackson protectively filed applications for Disability Insurance benefits and Supplemental Security Income benefits around July 30, 2009. (Tr. 157-64).  Plaintiff alleged she became disabled on December 31, 2008, due to suffering from carpal tunnel syndrome, fibromyalgia, and other ailments. (Tr. 157, 161, 201).  The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 68-74, 80-93).

1

At Plaintiff's request, administrative law judge ("ALJ") Jennifer Whang convened an administrative hearing on October 19, 2011 to evaluate Plaintiff's application. (Tr. 13-42). Jackson, represented by counsel, appeared and testified before the ALJ. (*Id*)  A vocational expert ("VE"), Selina Earl, and also appeared and testified. (*Id.*).  On November 2, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 50-61).  After applying the five-step sequential analysis,[1] the ALJ determined Anderson retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 269-72).  The Appeals Council denied her request for review, making the ALJ's November 2, 2011 determination the

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

final decision of the Commissioner. (Tr. 1-5).  Plaintiff now seeks judicial review of the ALJ's

final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II. EVIDENCE

### A.  Personal Background Information & Hearing Testimony

Plaintiff was born on June 16, 1965, and was 46 years old on the date the ALJ rendered

her decision. (Tr. 19).  Accordingly, at all relevant times, she was considered a "younger person"

for Social Security purposes. *See* 20 C.F.R. §§ 416.963(c), 404.1563(c).  Plaintiff completed the

tenth grade. (Tr. 211).  Jackson has past work as a waitress, a stock clerk, a cook helper, and a

telemarketer. (Tr. 38).

During the relevant period, Jackson performed some part-time work.  Plaintiff began

working as a fast food worker in June 2008. (Tr. 184).  She worked approximately 15 hours per

week. (*Id.*).  Jackson held the position until she underwent carpal tunnel release surgery around

August 2010. (Tr. 22-23, 259, 677-78).  Although Plaintiff attempted to return to work after the

surgery, she testified that her employer would not let her return because she had requested too

much time off. (Tr. 23).  Jackson was also self-employed braiding hair in 2009, and reported

cutting back the number of hours she worked as her condition declined. (Tr. 193-96).  She

currently does some work as a sales representative for the Avon company. (Tr. 23-24).

Plaintiff shared an apartment with her two-year-old granddaughter, for whom she served

as the primary care giver. (Tr. 20, 24-25).  She indicated that her fiancé did not reside with her,

but provided assistance with caregiving and household chores. (Tr. 24, 25-26).  Jackson testified

that she was able to pull or lift a gallon of milk out of the refrigerator, move a computer mouse

with her hand, and write for short periods of time. (Tr. 28, 33-34).

### B.  Medical Evidence[2]

In June 2008, Plaintiff underwent an evaluation for a wrist splint for carpal tunnel syndrome. (Tr. 491, 493).  Upon evaluation, Plaintiff's senses were somewhat impaired, but her sensitivity to light touch remained intact. (Tr. 491).  Her wrist range of motion was within normal limits.  Her "functional deficits" were described as pain with gripping items and cutting food.  A therapist prescribed the splint for night-time use and during the day as needed. (*Id.*).

On October 9, 2008, Plaintiff treated with Robert Kalb, M.D. (Tr. 310-13).  Plaintiff had positive Tinel and Phalen's tests bilaterally. (Tr. 311).  The doctor recounted that Plaintiff underwent a nerve conduction study on September 25, 2008, which was positive for mild bilateral median neuropathy. (Tr. 312).  Dr. Kalb diagnosed a number of impairments, including carpal tunnel syndrome. (*Id.*).  He encouraged Plaintiff to exercise at home, lose weight, and discontinue smoking. (*Id.*).

In June 2009, Plaintiff sought treatment at the Toledo Hospital due to wrist issues. (Tr. 507-08).  She exhibited a positive Tinel's sign and carpal tunnel release surgery was recommended. (Tr. 508).

On June 10, 2010, orthopedist Dennis Assenmacher, M.D., examined Plaintiff. (Tr. 692-93).  Plaintiff indicated that she was right-handed, and experienced pain and numbness in her right arm. (Tr. 692).  An examination showed weakness of abductor pollicis brevis muscles in the right thumb and decreased sensation of median nerve distribution of the right hand.  The doctor recommended carpal tunnel release surgery and an updated EMG. (*Id.*).

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.  Plaintiff's appeal focuses on the limitations that arise from her carpal tunnel syndrome and ulnar neuropathy and the recitation of medical evidence will focus on the same.

On July 20, 2010, Plaintiff treated with David Szymanski, M.D., who performed an EMG. (Tr. 636-37).  Dr. Szymanski noted Plaintiff's complaints of numbness and aching pain in her right hand and wrist. (Tr. 636).  Plaintiff stated that the numbness often awakened her at night and was exacerbated by talking on the phone, writing, or holding a steering wheel.  Dr. Szymanski opined that Plaintiff had "[r]ight-sided carpal tunnel syndrome moderately affecting mainly sensory fibers."  He observed no underlying cervical radiculopathy. (*Id.*).

On August 16, 2010, Dr. Assenmacher performed carpal tunnel release surgery on Plaintiff's right wrist. (Tr. 677-78). Plaintiff was hospitalized from August 27, 2010 to September 2, 2010, due to developing cellulitis and an abscess. (Tr. 641-75, 831).

Plaintiff followed up with Dr. Assenmacher on September 9, 2010, and reported moderate pain, but felt she was improving. (Tr. 685).  An examination showed sensation intact throughout her hand, with mild decreased sensation in the right little finger.  The surgical wound appeared well healed. (*Id.*).

On October 8, 2010, Plaintiff reported pain at her scar and slight decreased flexion of her fingers to Dr. Assenmacher. (Tr. 684).  She stated that her sensation was good, but the right little finger had not regained all sensation.  Upon physical examination, Dr. Assenmacher found that Plaintiff had a satisfactory response to a pin prick test on the two outer fingers of her right hand. There was some decreased flexion in the ring and little fingers.  The doctor prescribed physical therapy three times per week for six weeks, Percocet, and a wrist brace.  Dr. Assenmacher ordered Jackson to remain off work from August 16, 2010, to November 15, 2010. (*Id.*).

On November 12, 2010, Plaintiff returned to Dr. Assenmacher and reported mild to moderate pain in her wrist, particularly with physical therapy and the use of her hand.  (Tr. 683). However, she did not experience numbness.  Upon examination, Plaintiff exhibited good

abductor pollicis brevis strength, had minimal tenderness on her surgical scar, moved her fingers well, and had intact sensation.  Plaintiff was prescribed Percocet, but advised not to continue the pain medication much longer.  Dr. Assenmacher indicated that Jackson should remain off of work from August 16, 2010 to January 10, 2011.  He referred her to pain management. (*Id.*).

Plaintiff attended pain management with James Weiss, M.D., on November 16, 2010. (Tr. 841-43).  Jackson presented for a medication review and refill. (Tr. 841).  Dr. Weiss noted that a recent evaluation had found Plaintiff at moderate risk for opioid problems.  During the visit, Jackson was confrontational and the doctor recommended that she see a psychiatrist. (*Id.*).

On December 14, 2010, Plaintiff treated with James North, M.D. (Tr. 827).  Dr. North recounted that Dr. Weiss had recently discharged Jackson from his practice because they did not see eye-to-eye.  Plaintiff reported taking Percocet and Vicodin twice daily.  Jackson complained of pain in her wrist, as well as numbness and tingling in both upper extremities.  Dr. North explained that Plaintiff had a cervical and lumbar spine MRI performed, the results of which were normal.  Dr. North agreed to keep Plaintiff on her current medications in the short term until she could find another pain management physician.  He ordered an EMG of her upper extremities.  The doctor was not optimistic that a treatable cause would be discovered for Plaintiff's neuropathic symptoms, but suspected that she suffered from fibromyalgia and chronic pain syndrome. (*Id.*).

On January 11, 2011, Plaintiff treated with Dr. North for medical issues unrelated to her wrist. (Tr. 824).  Dr. North indicated that Plaintiff was to see healthcare providers at Advanced Pain Management so that they could oversee her pain medication prescriptions. (*Id.*).

Neurologist Mahmound Mohamed, M.D., evaluated Jackson on January 12, 2011. (Tr. 731-32).  Plaintiff described significant numbness and tingling in her right little finger, as well as

6

numbness and tingling in both of her hands and arms. (Tr. 731).  Her motor examination was largely unremarkable, aside from what the doctor identified as "mild generalized weakness."  Dr. Mohamed thought that Jackson might have bilateral carpal tunnel syndrome and right ulnar mononeuropathy, and requested an EMG and nerve conduction studies of the bilateral upper extremities. (*Id.*).

An "EMG/NCV Report" was completed on January 25, 2011. (Tr. 727-28).  Testing showed evidence of bilateral, median mononeuropathy and carpal tunnel syndrome that was sensory and motor on the left side and only sensory on the right side. (Tr. 728).  There was also evidence of bilateral sensory neuropathy, but no evidence of cervical radiculopathy of the upper extremities. (*Id.*).

Jackson followed up with Dr. North on February 15, 2011. (Tr. 823).  Although Dr. North discussed surgery as an option, Plaintiff indicated that she did not wish to pursue additional surgical treatment, particularly because of the infection she experienced following her carpal tunnel release.  Jackson reported that she found Lyrica helpful for her nerve pain and was working with physical therapy. (*Id.*).

Plaintiff returned to Dr. North on March 22, 2011. (Tr. 819).  She was still attending physical therapy and making good progress with regard to her ulnar and carpal tunnel neuropathy.   Dr. North discussed their efforts to get Plaintiff into pain management, recommending that she see Dr. Goyal because Advanced Pain Management refused her as a patient.  Dr. North continued Plaintiff's prescriptions of Percocet and Vicodin. (*Id.*).

That same day Dr. North completed a medical source statement setting forth his opinions as to Plaintiff's physical abilities and limitations. (Tr. 744-45).  During an eight hour workday, Plaintiff could: (1) stand or walk for 30 minutes continuously and for 2 hours total; (2) sit for 60

minutes continuously and 6 hours total; (3) lift and carry 5 pounds occasionally and less than 5 pounds frequently. (Tr. 744).  Jackson could occasionally stoop; balance; finger; handle; reach; twist; climb stairs; walk on uneven ground; operate hand and foot controls; work around hazardous machinery; operate a motor vehicle; tolerate heat and cold; and tolerate dust, smoke, or fume exposure. (*Id.*).  Plaintiff complained of moderate pain due to arthritis, myelopathy, and fibroids. (Tr. 745).  Dr. North indicated that Plaintiff took medication in the form of Lyrica, Trazodone, and Risperdal, which could adversely affect her work performance. (*Id.*).

### III.  SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since December 31, 2008, the alleged onset date.

3. The claimant has the following severe impairments: carpal tunnel syndrome; right shoulder impingement; right rotator cuff tear; osteoarthritis in the ankles; mild multilevel degenerative disc disease in the cervical spine; fibromyalgia; obesity; major depressive disorder; post-traumatic stress disorder ("PTSD"); and polysubstance abuse in remission.

4. The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except that she requires a sit/stand option, allowing her to alternate between a sitting and standing position every thirty minutes; can do frequent but not constant reaching, including overhead reaching, handling, fingering with the dominant upper right extremity; can only occasionally use ramps and climb stairs, but she can never climb ladders, ropes, or scaffolds; should avoid hazards, including moving machinery and unprotected heights; should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation; should be limited to simple, routine and repetitive tasks; and requires a low stress job, defined as having only occasional decision making and occasional changes in work setting.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on June 16, 1965 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has a limited education and is able to communicate in English.

   . . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, since December 31, 2008, through the date of this decision.

(Tr. 50-61) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 Fed. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535

9

(6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

### A.  The ALJ's treating source analysis

Jackson asserts that the ALJ's partial rejection of Dr. North's opinion did not comport with the treating physician doctrine. Dr. North began treating Plaintiff in December 2010. (Tr. 827). Jackson presented to Dr. North approximately four times before the physician completed a medical source statement on March 22, 2011.

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule" is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment

10

history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).  The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544. When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6).  The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

In the present case, the ALJ confronted Dr. North's March 2011 medical source statement. (Tr. 58-59).  The ALJ recounted the limitations the doctor suggested. (Tr. 58). Thereafter, the ALJ accepted the doctor's finding that Plaintiff was limited to work at the sedentary exertional level. (Tr. 59).  However, the ALJ gave "little weight" to Dr. North's opinion that Plaintiff was able to lift no more than 5 pounds and could only occasionally finger and handle.  The ALJ devaluated these limitations because they were not sufficiently supported by medical data.  Additionally, the ALJ noted that Plaintiff's work as both a fast food restaurant service worker and a hair braider during the period for which she claimed disability undermined such limitations. (*Id.*).

Plaintiff asserts that the ALJ failed to give good reasons for the decision to devalue Dr. North's recommendations.  However, the undersigned concludes that the ALJ gave adequate reasons in support of the treating source analysis.

The ALJ properly found that the work activity Jackson engaged in during the period which she claims to have been disabled undermined the strict lifting, fingering, and handling restrictions that Dr. North recommended.  Jackson asserts that because she performed work as a fast food worker for only 15 hours a week and had to quit this job after her carpal tunnel surgery, the evidence does not support a finding that she could sustain work activity on a regular and continuing basis.  Likewise, she indicates that she only worked as a hair braider a few hours a week, which was not consistent with an ability to use her hands "frequently" as the RFC requires.

Despite Plaintiff's arguments, it is well-established that an ALJ may consider a claimant's activities as among the reasons for discounting a treating source's opinion as long as the ALJ accurately describes such activities. *Luck v. Comm'r of Soc. Sec.*, No. 3:13-CV-687, 2014 WL 1383315, at *9 (N.D. Ohio Apr. 9, 2014) (*citing Engebrecht v. Colvin*, No. 12-11342, 2013 WL 4604597, at *22 (E.D. Mich. Aug. 29, 2013)).  Here, the ALJ found that the activities Plaintiff engaged in did not support the degree of limitation Dr. North recommended.  Contrary to her arguments now, Jackson testified during the administrative hearing that she tried to return to work when Dr. Assenbacher permitted her to do so after surgery, but indicated that she was unsuccessful due to reasons unrelated to her physical limitations. (Tr. 23).  The ALJ appropriately looked to Plaintiff's work activities, both of which required her to use her hands, and determined that such activity did not comport with the limitations the doctor recommended.

Next, the ALJ reasonably indicated that the strictness of the limitations recommended by Dr. North were not sufficiently supported by medical evidence in the record. (Tr. 59).  Although the ALJ did not discuss the medical evidence that related to Plaintiff's wrist impairments during the treating source analysis, earlier in her opinion, the ALJ summarized this medical evidence,

which supports her conclusion with regard to Dr. North's lifting, handling, and fingering limitations. (Tr. 56).  The ALJ acknowledged Plaintiff's 2008 diagnosis of bilateral medial neuropathy. (Tr. 56, 312).  The ALJ also explained that Jackson's carpal tunnel syndrome in the right hand had worsened to the point where surgery was performed in August 2010. (Tr. 56). However, the ALJ further observed that medical records three months after surgery showed improvement:  Jackson had good muscle strength in her right hand, was able to move her fingers well, and had intact sensation. (Tr. 56, 683).  The ALJ acknowledged Plaintiff's continued complaints of wrist pain following surgery, but observed that Jackson described her pain as only mild to moderate, and that she did not experience numbness. (*Id.*).  The ALJ also pointed out that Dr. Assenmacher prohibited Jackson from working only until January 2011, permitting her to resume work activity six months after surgery.

Plaintiff argues that the ALJ erred in discounting Dr. North on the ground that his opinion was not supported by medical evidence, because the ALJ failed to discuss three pieces of evidence.  Plaintiff points out that she had a positive Tinel's and Phalen's test bilaterally in October 2008, and a Positive Tinel's sign in June 2009. (Tr. 311, 508).  Jackson also points to an EMG/NCV study performed in January 2011, which was taken after her carpal tunnel surgery. The study showed evidence of bilateral median neuropathy, which was sensory and motor in nature on the left, and only sensory in nature on the right.

An ALJ has the responsibility to consider all of the evidence in the record before him.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (*citing Loral Defense Systems-Akron v. N.L.R.B.*, 200 F. 3d 453 (6th Cir. 1999)).  However, it is well-established that "[a]n ALJ need not discuss every piece of evidence in the record for his decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  While it would

have been preferable for the ALJ to discuss these studies, Jackson has not provided evidence sufficient to show an oversight by the ALJ to call into question her review. The ALJ reviewed the record, and discussed much of the evidence related to Plaintiff's wrist impairments.

Additionally, such evidence does not undermine the substantial support that exists for the ALJ's treating source analysis. The results of the EMG/NCV report indicate that Plaintiff suffered from bilateral median neuropathy. Similarly, the additional tests Plaintiff highlights appear to do the same. However, the mere diagnosis of a condition does not speak to its severity or indicate the functional limitations caused by the ailment. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990). As a result, the fact that the testing or imagining indicated that Plaintiff had such a condition is not enough to show that the condition was disabling or entitle Dr. North's opinion to greater weight. The Court notes that Plaintiff does not point to opinions from physicians limiting Plaintiff's activity as result of these findings.

Jackson also suggests that the ALJ substituted her own lay opinion for that of Dr. North. It is correct, that an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by medical evidence." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (*quoting Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006)). Yet, the ALJ reserves the right to decide certain pertinent issues, such as the claimant's credibility, RFC, and employability. Furthermore, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (internal citations omitted).

The ALJ did not improperly supplant Dr. North's opinion when she determined that portions of the doctor's opinion was deserving of little weight. The ALJ assessed the evidence

14

of record and found it inconsistent with Dr. North's opinion. Plaintiff does not point to other medical opinions of record that support the limitations Dr. North assigned. Accordingly, Plaintiff's allegation of error fails.

### B. The ALJ's Step Five Finding

Plaintiff contends that the VE's testimony in this case does not serve as substantial evidence in support of the ALJ's finding at the final step of the sequential analysis. The VE testified that there were three jobs Plaintiff could perform when considering her RFC:  order clerk, charge-account clerk, and bench hand.[3] (Tr. 39).

Plaintiff asserts that a conflict exists with regard to the job of bench hand. She explains that according to the Dictionary of Occupational Titles ("DOT") the job involves reaching and handling *constantly*. However, the RFC set forth by the ALJ limited her to reaching and handling *frequently*, and as a result, the job of bench hand exceeds her RFC. Plaintiff contends that because the bench hand position does not meet the requirements of the RFC, but the ALJ nonetheless relied on the job—along with two others—to show that a significant number of jobs existed, his step five finding is flawed. Plaintiff also contends that Social Security Ruling ("SSR") 00-4p requires the administrative law judge to question the vocational expert regarding possible conflicts between testimony and the DOT and to elicit reasonable explanations for any apparent conflicts. Plaintiff asserts that the ALJ's failure to inquire into the conflict, and subsequent reliance on the VE's testimony, rendered the step five finding in error.

SSR 00-4p provides that an adjudicator must elicit a reasonable explanation from a VE when there is an apparent conflict between the VE's testimony and the DOT:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an

---

[3] *See* DOT 209.567-014 (G.P.O.), 1991 WL 671794 (order clerk), DOT 205.367-014 (G.P.O.), 1991 WL 671715 (charge-account clerk), and DOT 715.684-026 (G.P.O.), 1991 WL 679344 (bench hand).

> *apparent unresolved conflict* between VE or VS evidence and the DOT, the
> adjudicator must elicit a reasonable explanation for the conflict before relying on
> the VE or VS evidence to support a determination or decision about whether the
> claimant is disabled. At the hearings level, as part of the adjudicator's duty to
> fully develop the record, the adjudicator will inquire, on the record, as to whether
> or not there is such consistency.

SSR 00-4P, 2000 WL 1898704, at *2 (2000) (emphasis added).  If an adjudicator asks the VE whether there is a conflict between the VE's testimony and the DOT, and the VE credibly testifies that there is no conflict, the adjudicator may rely on the VE's testimony. *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).  The ALJ is not under an obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p, because that obligation falls to the plaintiff's counsel, who has the opportunity to cross-examine the VE and bring out any conflicts with the DOT. *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009).  The failure by counsel to do so is not grounds for relief. *Id.*

Plaintiff correctly asserts that the reaching and handling restrictions contained in the RFC do not comport with those set out by the DOT for the job of bench hand.  Nevertheless, for a number of reasons, the Court cannot agree that this fact requires remand.  First, the ALJ inquired whether the VE's testimony was consistent with the DOT, and the VE stated that it was. (Tr. 37). Additionally, Plaintiff's attorney did not identify the alleged specific discrepancy between the VE's testimony and the DOT that she now raises at the hearing.  Nor has Jackson explained how the discrepancy was "apparent" at the hearing such that the ALJ should have noticed, inquired about, and resolved it.  Accordingly, there is no basis to conclude that the ALJ failed to properly resolve any conflicts between the VE's testimony and the DOT.

Furthermore, even assuming that the bench hand positions cannot support the ALJ's step five finding, the VE identified a significant number of other jobs that Plaintiff could perform with her physical limitations.  More specifically, with regard to the order clerk and charge-

account clerk positions, the VE identified 6,100 jobs in the state of Ohio and 44,110 jobs in the nation. (Tr. 39, 60-61).

Plaintiff argues that the step five finding is nevertheless flawed.  According to Plaintiff, the state of Ohio was not a proper region to be considered; she posits that the VE ought to have identified the number of jobs in the region in which she resides.  Additionally, Jackson contends that the Court does not have the authority to determine whether there are still a significant number of jobs when the bench hand position is eliminated.  Plaintiff's arguments are not well-taken.

Work exists in the national economy when it exists in significant numbers either in the region where the claimant lives "or in several other regions of the country." 20 C.F.R. §§404.1566(a), 416.966(a).  "It does not matter whether work exists in the immediate area in which you live." 20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1).  Thus, the text of regulations plainly indicates that as long as work exists in significant numbers in the region where the claimant lives *or several other regions*, the claimant will not be found disabled, even if there is a lack of work in the claimant's "immediate area."  As a result, Plaintiff's argument that the ALJ erred in relying on the VE's testimony regarding jobs in the state of Ohio and the nation is without legal support.

Additionally, Plaintiff has not persuaded the Court that the number of jobs available in Ohio and in the nation is not significant.  When jobs that a claimant disputes fail to meet the requirements of the RFC are eliminated, courts may determine whether a significant number of jobs still remain to sufficiently support the ALJ's step five finding. *See Troxal v. Comm'r of Soc. Sec. Admin.*, 113 F. App'x 80, 83 (6th Cir. 2004).  There is no bright line that separates a "significant number" of jobs from an "insignificant number." *Hall v. Bowen*, 837 F.2d 272, 275

17

(6th Cir. 1988).  "The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.*

Here, the undersigned concludes that 6,100 jobs in the state of Ohio and 44,110 jobs in the nation meets the ALJ's step five burden of proving that there exist jobs in significant numbers in the national economy that Plaintiff can perform. Contrary to Plaintiff's contention, such figures can constitute a significant number. *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006) (finding that 870 jobs can constitute a significant number in a geographic region); *Bishop v. Shalala*, 64 F.3d 662 (Table), No. 94-5375, 1995 WL 490126, at *2-3 (6th Cir. Aug.15, 1995) (finding that 6,100 jobs nationally constituted a significant number of jobs); *Girt v. Astrue*, No. 5:09-CV-1218, 2010 WL 908663, at *4 (N.D. Ohio Mar. 12, 2010) (finding that 600 jobs state-wide and 35,000 jobs nationally constituted a significant number of jobs).

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  November 7, 2014.

18